IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

RICHARD LEE PYLES

PLAINTIFF

V.                          Civil No. 2:22-cv-02069-PKH-MEF

KILOLO KIJAKAZI, Acting Commissioner,
Social Security Administration                          DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Richard Pyles, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (the "Commissioner") denying his claim for supplemental security income ("SSI") under Title XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. § 1382.  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  *See* 42 U.S.C. § 405(g).

## I.       Procedural Background

Plaintiff filed his application for SSI on May 24, 2019[1], alleging disability since August 1, 2017, due to heart blockage, high blood pressure, anxiety, and seizure disorder that had rendered his past relevant work ("PRW") unsafe.  (ECF No. 14, pp. 90, 107, 209-215, 231, 245-246).  An administrative hearing was held telephonically on February 23, 2021.  (*Id*. at 53-68).  Plaintiff was present and represented by counsel.

Born on November 20, 1967, Plaintiff was 51 years old on his alleged onset date and possessed a high school education.  (ECF No. 14, pp. 43, 232).  He had no qualifying PRW.  (*Id*.).

On July 8, 2021, Administrative Law Judge ("ALJ"), Bill Jones identified Plaintiff's seizure disorder, anxiety, post-traumatic stress disorder ("PTSD") and depression as severe

---

[1] The Plaintiff filed a prior application for DIB that was denied on November 30, 2015.  (ECF No. 14, pp. 72-82).

impairments, but he concluded Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (ECF No. 14, p. 35-36).  Despite his impairments, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform a full range of light work with the following mental limitations: he must avoid all exposure to hazards such as dangerous machinery and unprotected heights; he is limited to work where the interpersonal contact is routine but superficial (e.g. grocery checker); the tasks are no more complex than those learned by experience with several variables; the judgment required is within limits; and the supervision required is little for routine tasks, but detailed for non-routine tasks.  (*Id*. at 37).  With the assistance of a vocational expert ("VE"), the ALJ ultimately decided there were jobs that exist in significant numbers in the national economy that the Plaintiff could perform, including industrial cleaner, hospital cleaner, and linen checker.  (*Id*. at 44).

The Appeals Council denied Plaintiff's request for review on March 4, 2022.  (ECF No. 14, pp. 6-11).  Plaintiff subsequently filed this action on April 26, 2022.  (ECF No. 2).  Both parties have filed appeal briefs (ECF Nos. 16, 18), and the matter is ready for Report and Recommendation.

## II.    Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings.  *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010).  Substantial evidence is less than a preponderance but enough that a reasonable mind would find it adequate to support the Commissioner's decision.  *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019).  We must affirm the ALJ's decision if the record contains substantial evidence to support it.  *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014).  If there is substantial evidence in the record that

supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id.*

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. 20 C.F.R. § 416.920(a)(4). The fact finder only considers Plaintiff's age, education, and work experience in the light of his RFC if the final stage of the analysis is reached. 20 C.F.R. § 416.920(a)(4)(v).

### III.   Discussion

Plaintiff raises three issues on appeal: (1) whether the Plaintiff's seizure disorder met or equaled Listing 11.02; (2) whether the Plaintiff's heart condition met or equaled Listing 4.00; and (3), whether the ALJ's RFC determination is supported by substantial evidence.  Of particular concern to the undersigned, however, is the Plaintiff's argument concerning Listing 11.02.

To meet a listing, a claimant must show that their impairment meets all the specified medical criteria in that listing.  *Sullivan v. Zebley*, 493 U.S. 521, 524-25, 532-33 (1990) (superseded on other grounds).  Thus, Listing 11.02 can be met by producing evidence sufficient to show the requirements set forth in paragraph A, B, C, or D of the listing.  Paragraph A requires a showing of generalized tonic-clonic seizures at least once a month for three consecutive months despite adherence to prescribed treatment, while Paragraph B requires evidence of dyscognitive seizures at least once a week for at least three consecutive months despite adherence to prescribed treatment.  20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 11.02.  Paragraphs C and D also require evidence of generalized tonic-clonic seizures or dyscognitive seizures, respectively, albeit less frequent than paragraphs A and B, with a marked limitation in one of the following areas of functioning: physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.  *Id*.

Listing 11.00 defines a generalized tonic-clonic seizure as a seizure characterized by a loss of consciousness accompanied by sudden muscle tensing that results in the loss of postural control followed by rapid cycles of muscle contraction and relaxation (convulsions).  20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 11.00H(1)(a).  Dyscognitive seizures also involve a loss of consciousness

but are not accompanied by convulsions or loss of muscle control.  *Id*. at Listing 11.00H(1)(b).  It is significant to note, however, that psychogenic seizures, or seizures that are found to be the physical manifestation of underlying psychological distress, are not evaluated under Listing 11.02, but rather under Listing 12.00, which deals with mental health disorders.  *Id*. at Listing 11.00H(4)(e).

Plaintiff has an extensive history of seizure disorder, dating back to at least May 2018, when he experienced a heat stroke.  On May 14, 2018, Plaintiff experienced an episode of lightheadedness, presyncope, and intermittent chest pain while in a Walmart.  (ECF No. 14, pp. 315-330).  Upon arrival in the emergency room ("ER"), the Plaintiff was said to be weak and spitting up blood, but he was alert, fully oriented, neurologically intact, and cooperative with an appropriate mood and affect and a blood pressure of 140/72.  An EKG showed a possible inferior infarction of undetermined age.  The doctor diagnosed epilepsy and prescribed Levetiracetam (brand name Keppra) and Lisinopril.

Two days later, Plaintiff returned to the ER after experiencing several seizures one after another.  (ECF No. 14, pp. 331-355).  He complained of a sore tongue and a headache.  Again, an exam was unremarkable revealing him to be alert and fully oriented with normal motor strength, speech, coordination, and sensation and elevated blood pressure (148/83).  A CT scan of his brain was negative while lab tests uncovered dehydration and an elevated hemoglobin level.  The Plaintiff was discharged home with a diagnosis of recurrent seizures after receiving a dose of Lorazepam (brand name Ativan).

On June 8, 2018, he again presented in the ER following a multi-episode generalized seizure witnessed by family.  (ECF No. 14, pp. 356-377).  Plaintiff reported a headache prior to the seizures and brief confusion afterward.  At the time of presentation, however, his exam was

5

unremarkable, both physically and mentally.  A repeat CT scan was normal, and an EKG continued to show an inferior infarction.  The physician diagnosed hypertension and recurrent seizures, prescribed Lorazepam, and increased his Levetiracetam dosage.

An EEG dated June 21, 2018, was essentially normal, revealing no epileptiform discharges. (ECF No. 14, pp. 378-379).  Test results indicated, however, that the absence of epileptiform discharges cannot conclusively rule out an epileptic disorder.

Plaintiff conferred with Dr. Wilson Cruz-Leal for medication refills on July 5, 2018.  (ECF No. 14, pp. 557-559).  He advised the doctor that the Lorazepam had helped calm him down. Although Dr. Cruz-Leal documented complaints of irritability, anxiety, and sleep disturbance, a mental status exam revealed Plaintiff to be alert and fully oriented with a normal affect.  There was no evidence of physical or mental abnormalities.  The doctor diagnosed essential hypertension, seizure disorder, and anger reaction, and he refilled Plaintiff's Lisinopril and Levetiracetam prescriptions.  He refused to refill the Lorazepam, and he advised the Plaintiff to follow-up with psychiatry.

On August 26, 2018, Plaintiff returned to the ER with complaints of chest pain and recurrent seizures.  (ECF No. 14, pp. 415-471).  His wife indicated that he had experienced four to six seizures that day, despite taking the Keppra as prescribed, but he averaged one seizure every three weeks.  The Plaintiff was alert and fully oriented with no focal neurological deficits and a blood pressure reading of 148/92.  He had a normal heart rate and rhythm with no evidence of murmur and normal peripheral perfusion.  An ER nurse did observe one of the Plaintiff's purported seizures, noting that he was able to tell her he was experiencing a seizure and nodded his head during the episode.  Dr. Kalyan Akkineni admitted him with a diagnosis of acute chest pain for both cardiology and neurology workups.  No further spells were recorded, and an EEG revealed

no events or abnormalities. To assist in his treatment, Plaintiff's wife provided video documentation of him experiencing a seizure at home. In the video, he allegedly closed his eyes, began to breath in an odd manner, and shook his head side to side. During one episode, he was able to put his hand on his head. Based on this visual evidence, Dr. Akkineni concluded the Plaintiff's episodes were not epileptic in nature and diagnosed probable psychogenic non-epileptic attacks ("PNEA"), chest pain, hypertension, and a history of syncope. Accordingly, he instructed the Plaintiff not to drive for one year; to avoid heights, heavy machinery, and swimming alone; to continue the Keppra; and to follow-up with cardiology and the University of Arkansas Medical Sciences' ("UAMS") epilepsy monitoring unit ("EMU").

A few days later, the Plaintiff was transported to the ER via ambulance for additional seizure activity. (ECF No. 14, pp. 472-516). His wife witnessed the seizure, which she said lasted approximately 10 minutes. Upon EMS's arrival, he was confused and exhibited a bloody nose and tongue. In the ER, he complained of a headache and anxiety but was alert, fully oriented, and cooperative with an appropriate mood and affect. A CT scan of his brain remained normal. The doctor diagnosed PNEA and stress reaction and prescribed Hydroxyzine.

On September 4, 2018, Plaintiff had a hospital follow-up with Dr. Cruz-Leal. (ECF No. 14, pp. 554-556). According to his wife, their neighbor had been aggravating him just prior to his last seizure. Dr. Cruz-Leal diagnosed dissociative convulsions/conversion disorder with seizures or convulsions, noting he would wait for the results of the UAMS's evaluation before following-up with the Plaintiff.

In November 2018, Plaintiff was evaluated by neurologist, Dr. Hillary Williams and admitted to the UAMS EMU for a 24-hour EEG. (ECF No. 14, pp. 520-539). Plaintiff had experienced only one event since his last exam. During the test, however, three seizure-like

episodes were documented, much like the episodes he was said to be experiencing at home.  These were determined to be non-epileptic and the Plaintiff was switched from Keppra to Depakote.  He was advised to follow-up with neurology and to reestablish with the psychiatric clinic.  Plaintiff was again restricted to no driving for one year and no bathtubs, swimming/water pools, climbing, or exposure to heights, hazardous activity, or hazardous material.

On February 11, 2019, he returned to the ER via ambulance following yet another seizure. (ECF No. 14, pp. 577-594).  By the time he arrived, however, he was at his neurological baseline and no seizure activity was recorded.  Again, a CT showed no acute intracranial abnormality.

Later that month, Plaintiff established care at the Belinga Neurology Clinic.  (ECF No. 14, pp. 546-547, 645-649).  He reported less frequent seizures following his last ER visit, but he had experienced one just two days earlier.  It was unlike any previous seizure in that he could not feel anything on his left side.  Plaintiff explained that his wife could tell when he was going to have a seizure because he became pale, his eyes watered, he would tense up, and he then blacked out. After a seizure, he was generally very weak.  An exam found him to be alert, fully oriented, and attentive with no cognitive, neurological, mental, motor, or sensory deficits.  Dr. Steve Belinga diagnosed complex partial seizures[2] evolving to generalized seizures, ordered an EEG and labs, and prescribed Oxtellar.

On March 8, 2019, Plaintiff had a post ER follow-up with Dr. Cruz-Leal.  (ECF No. 14, pp. 568-570).  He was alert and fully oriented with a normal mood and affect and intact memory. Dr. Cruz-Leal diagnosed essential hypertension, anxiety, and seizure disorder.  He refilled the Lisinopril, Buspirone (brand name Buspar), and Divalproex (brand name Depakote).

---

[2] Complex partial seizures are defined as seizures that begin in one half of the brain and result in an impairment in consciousness.  *See* The Johns Hopkins University, *Tonic and Clonic Seizures*, *at* https://www.hopkinsmedicine. org/health/conditions-and-diseases/epilepsy/tonic-and-clonic-seizures (Last accessed April 25, 2023). Generalized seizures, on the other hand, originate in both sides of the brain.  *Id*.

Plaintiff underwent a comprehensive psychological assessment at The Guidance Center on March 21, 2019. (ECF No. 14, pp. 625-634). He admitted that he had been diagnosed with non-epileptic attacks/seizures in the ER, indicating that the doctor felt his seizures were induced by anxiety. Plaintiff reported a history of depression since his senior year in high school when his parents separated and ultimately divorced. He also had a history of anger problems involving both verbal and physical aggression that had resulted in a three-year prison sentence for assaulting his ex-wife. Restlessness, insomnia, somatic complaints, avoidance of activities, and sleep disturbance were endorsed. An exam revealed an appropriate and broad mood/affect; normal speech, thought processes, and perception; intact memory; full orientation; an estimated average IQ; unimpaired insight and judgment; and a fair treatment prognosis. Advanced Practical Registered Nurse ("APRN"), Kelly Berry-Hert diagnosed post-traumatic stress disorder ("PTSD") and major depressive disorder.

When the Plaintiff returned to Dr. Belinga, in March, he reported that his seizures were the same or slightly better. (ECF No. 14, pp. 548-550, 643-645). His wife described an episode approximately two weeks prior that was less severe and shorter in duration than his normal episodes. In her opinion, he was improving. Once again, an EEG was normal, showing no seizure-like activity. Because the Plaintiff required such a large dose of Depakote, Dr. Belinga opted to taper down his dosage and to continue the Oxtellar, which also seemed to be helpful. Noting his prior diagnosis of pseudoseizures, Dr. Belinga continued to diagnose complex partial seizures evolving to generalized seizures.

An April 2019 follow-up with Dr. Belinga also revealed that his seizure disorder had improved on the lower dose of Depakote paired with Oxtellar. (ECF No. 14, pp. 638-639). His last seizure was reportedly two weeks earlier.

Plaintiff was involved in an automobile accident on July 12, 2019, and he was taken to the ER after experiencing multiple seizures, one of which was witnessed by EMS. (ECF No. 14, pp. 659-682). Upon his arrival, abrasions were noted to his right cheek and upper soft palate with neck swelling/tenderness; mild epigastric discomfort; and tenderness in the right knee, wrist, and left ankle. CT scans of his head, chest, neck, and abdomen were unremarkable, while x-rays of his right knee, left ankle, and left foot showed DJD and slightly displaced fractures of the medial malleolus and intra-articular proximal first phalanx. The doctor prescribed Norco and Robaxin and directed him to follow-up with orthopedics.

That same day, he was discharged from The Guidance Center after losing contact with them. (ECF No. 14, pp. 623-624).

Dr. Belinga completed a seizure statement on July 29, 2019, indicating that Plaintiff suffered from complex partial to generalized seizures for which Depakote and Oxtellar were prescribed. (ECF No. 14, pp. 652-653). By his account, Plaintiff experienced one to two seizures per month. Plaintiff's last seizure occurred on February 20, 2019, with symptoms to include a loss of consciousness, an alteration of awareness, and postictal antisocial behavior and muscle cramping.

When he returned on August 15, 2019, Dr. Belinga noted that Plaintiff had experienced black outs and tonic spells that could be seizures. (ECF No. 14, pp. 748). Although Keppra had not been particularly helpful standing alone, he opted to pair it with Oxtellar for greater coverage. Dr. Belinga diagnosed localized focal partial symptomatic epilepsy and epileptic syndromes with complex partial seizures that were not intractable and without status epilepticus.

10 days later, Plaintiff presented in the ER after experiencing a grand mal seizure at home. (ECF No. 14, pp. 683-697, 699-700, 705-719). As per EMS, in route to the hospital, he seized

twice.  The doctor administered both Versed and Valium.  CT scans of his head and an EEG remained within normal limits.  Plaintiff was admitted and transferred to Washington Regional for a 24-hour EEG the following day, as this procedure was not available at Baptist Health.  While at Washington Regional, he experienced a seizure that was responsive to Ativan.  The doctor diagnosed a stable grand mal seizure/seizure disorder with worsening seizure activity of uncertain etiology, possibly psychogenic and related to the PTSD he suffered following the MVA in July, and PTSD/anxiety.  He was advised to continue the Keppra and Oxtellar, discontinue the Hydroxyzine, and prescribed Paxil and Buspar.

Treatment notes from a September 17, 2019, visit with Dr. Belinga revealed worsening seizures since his last visit and chronic fatigue.  (ECF No. 14, pp. 749-751).  Plaintiff indicated that his medications were changed in the ER and that he was "going without his anxiety medication."  Dr. Belinga discontinued the Keppra and Oxtellar and prescribed Topamax.

On October 21, 2019, Plaintiff reported some improvement in his seizures.  (ECF No. 14, pp. 752-754).  He had experienced only two seizures since his last visit.  Dr. Belinga continued the Topamax, noting that it "worked."  Aside from a broken left foot, physical and mental status exams were unremarkable.

On January 3, 2020, Plaintiff returned to the ER after experiencing yet another seizure.  (ECF No. 14, pp. 734-738).  Although he was out of Paxil, his mental status exam was noted to be baseline with a normal mood and affect.  Dr. Malik Shahid prescribed Lorazepam.

On January 11, 2020, Plaintiff sought out emergent care for worsening seizures since stopping the Lorazepam "quite a while back," but he also indicated that his seizures generally fluctuated in frequency.  (ECF No. 14, pp. 738-746).  He had experienced a seizure just prior to

his arrival and reported a seizure the previous week.  The doctor diagnosed seizures and advised

him to follow-up with Dr. Belinga.

Two days later, Plaintiff advised Dr. Belinga that his seizures were again getting worse, as

he had experienced four seizures since his last visit.  (ECF No. 14, pp. 755-757).  He had also run

out of seizure medication.  Therefore, Dr. Belinga refilled the Topamax.

In an April 2020 statement, Dr. Belinga indicated that the Plaintiff continued to experience

one to two seizures per month, which he diagnosed as focal partial symptomatic epilepsy and

epileptic syndromes with complex seizures.  (ECF No. 14, pp. 764-765).  His most recent seizure

had occurred on April 14, 2020, but he had been seen seven times in 2020 for seizures and reported

33 seizures between August and October of 2019.

On January 28, 2021, Plaintiff's wife advised neurologist, Dr. Margaret Tremwell that he

was experiencing monthly cluster seizures with the shaking lasting 15 to 20 minutes, tongue biting,

unresponsiveness to verbal communication, no recollection of the episode, and postictal headaches

and confusion.  (ECF No. 14, pp. 766-769).  Dr. Tremwell noted that a single event at Washington

Regional had been documented as a possible pseudoseizure, but many of his past events were also

suggestive of epileptic seizure.  Accordingly, she continued his medications and referred him to

neuropsychologist, Dr. Victor Biton for a definitive diagnosis.

Based on this evidence, the ALJ concluded that the Plaintiff's seizures were psychogenic

in nature.  An ALJ must not, however, substitute his opinions for those of the physician.  *Finch v.
Astrue*, 547 F. 3d 933, 937-938 (8th Cir. 2008).  Rather, when a critical issue is undeveloped or

underdeveloped, he is required to recontact a treating or consulting physician for clarification.  *See
Jones v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010).  And, here, several factors undermine the ALJ's

conclusion that the Plaintiff's seizures were clearly psychogenic in nature.  These factors include

Dr. Belinga's consistent diagnoses of focal partial symptomatic epilepsy and epileptic syndromes with complex seizures; the Plaintiff's favorable response to antiseizure medication, which is not characteristic of psychogenic seizures[3]; the continuation of seizure activity despite the use of antianxiety medications; the absence of exam findings to document mental status changes or agitation, even immediately after an episode witnessed by medical personnel; and Dr. Tremwell's admission that the record contained evidence of both epileptic and nonepileptic seizure activity.

The mere fact that the Plaintiff's seizures were responsive to Ativan fails to support a finding of psychogenic seizures, as Ativan is approved to treat all types of seizures, including epileptic seizures. *See* Epilepsy Foundation, *Oral Rescue Medicines*, *at* https://www.epilepsy.com /treatment/seizurerescuetherapies/oralrescuemedicines#:~:text=Lorazepam%20and%20diazepam%20a ct%20quickly,a%20longer%20period%20of%20time (Last Accessed April 26, 2023). It reduces the uncontrolled firing of neurons that cause seizures. *Id*. Further, the absence of epileptic discharge on both EEGs and CT scans does not negate the presence of a neurological seizure disorder, as these tests can only detect discharges that occur while the test is in progress or permanent damage left by prior seizure activity. It is also significant to note that both non-examining physicians included epilepsy as a diagnosis and assessed seizure precautions. (ECF No. 14, pp. 98-99, 116-118). Therefore, additional information is necessary before a conclusion can be made as to the Plaintiff's exact diagnosis.

Accordingly, it is for these reasons we conclude that remand is necessary to allow the ALJ to recontact the Plaintiff's neurologists (Drs. Belinga and Tremwell) to obtain RFC assessments. Said assessments must include the criteria set forth in Listing 11.02 and request that the doctors

---

[3] Individuals suffering from psychogenic seizures will not respond to antiseizure medication. *See* Epilepsy Foundation, *Psychogenic Nonepileptic Seizures (PNES)*, *at* https://www.epilepsy.com/diagnosis/imitators-epilepsy/psychogenic-nonepileptic-seizures#:~:text=A%20person%20with%20PNES%20will,been%20proven%20to%20treat%20PNES. There are currently no medications that are effective in treating PNES. *Id*.

provide a precise statement as to the Plaintiff's diagnosis, an opinion as to whether his seizures satisfy the listing, and a description as to how the Plaintiff's seizures meet the listing.

The ALJ should also obtain the neuropsychological findings of Dr. Victor Biton, if available, and, if not, order a neuropsychological evaluation to ensure that the record is fully developed in this regard.

## VI.    Conclusion

For the reasons stated above, I recommend reversing and remanding this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 8th day of May 2023.

/s/ Mark E. Ford
HON. MARK E. FORD
CHIEF UNITED STATES MAGISTRATE JUDGE